## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### (Eastern Division)

|  |  |
|---|---|
| _____ ) | |
| In re: ) | |
| ) | Chapter 7 |
| INOFIN INCORPORATED, ) | Case No. 11-11010-JFN |
| ) | |
| Debtor. ) | |
| _____) | |
| MARK G. DEGIACOMO, CHAPTER 7 ) | |
| TRUSTEE OF THE ESTATE OF ) | |
| INOFIN, INCORPORATED, ) | |
| Plaintiff, ) | 1:16-cv-10528-NMG |
| v. ) | |
| ) | 1:14-cv-10483-NMG |
| HOLLAND & KNIGHT, LLP and ) | |
| RICHARD J. HINDLIAN, ) | |
| Defendants. ) | |
| _____) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT

### Introduction

This legal malpractice action arises out of the Chapter 7 bankruptcy of Inofin, Inc.
("Inofin" or the "Company"). The bankruptcy trustee, Mark DeGiacomo ("Trustee"), has sued
Holland & Knight LLP ("H&K") and a partner at H&K, Richard J. Hindlian ("Hindlian"), in
connection with H&K's pre-bankruptcy representation of Inofin. As set forth below, the
Trustee's claims should be dismissed on grounds of in pari delicto and for lack of proximate
causation.

### Introduction and Summary of Position

For purposes of this litigation, the Trustee stands in the shoes of Inofin: he bears the
same burden as Inofin would have in establishing his prima facie case, and he is subject to the

same defenses that H&K could have raised in a nonbankruptcy suit brought directly by Inofin itself.

Inofin was established in 1994. Prior to its bankruptcy, Inofin was in the motor vehicle finance business, raising capital from individual investors to fund used car loans in the subprime market. A 2009 SEC investigation into Inofin's method of raising capital uncovered fraudulent activities on a massive scale, including fraudulent misrepresentations to investors. The SEC brought securities fraud claims against the Company, and its two principals, Michael Cuomo ("Cuomo") and Kevin Mann ("Mann"). Mann and Cuomo both agreed to Consent Orders against them. Mann and Cuomo also are under criminal indictment for mail and wire fraud relating to their activities at Inofin.[1]

In this lawsuit, the Trustee claims that H&K negligently failed to provide adequate securities advice to Inofin in or around January, 2009. The Trustee alleges that H&K failed to properly advise Inofin that promissory notes it issued to investors to raise capital for its operations were "securities" under the federal securities laws and that Inofin had no choice but to register the notes with the SEC or comply with lawful exemptions. The Trustee alleges that if H&K had advised Inofin that its notes were securities, Inofin would not have been able to continue raising money from investors and it would have been forced to cease business and liquidate two years before the February 9, 2011 bankruptcy petition date ("Petition Date"). By early 2009, Inofin already was insolvent with a negative net worth of over $20 million. According to the Trustee's theory, however, H&K's malpractice resulted in "prolonging Inofin's existence" and, therefore, H&K is responsible for an additional $12 million of liabilities incurred during Inofin's final two years.

---

[1] Cuomo and certain of his family members have submitted proofs of claim in this bankruptcy proceeding. Melissa George (the daughter of Mann and Inofin's former CFO) also has submitted a proof of claim.

As shown below, irrespective of whether H&K committed malpractice (which H&K vehemently denies), the Trustee's claim must be dismissed on grounds of _in pari delicto_ because the undisputed facts establish that Inofin's own fraudulent conduct was the primary means by which it prolonged its existence from early 2009 to the Petition Date. Indeed, Inofin had been insolvent since at least 2005. If it had disclosed its true financial condition to investors or the Massachusetts agency that regulated its activities in any of the years 2005-2008, it would have been out of business years before the date of the alleged malpractice in this case (early 2009). No reasonable factfinder could conclude that H&K was more responsible than Inofin for the prolongation of the Company's business.[2]

Independent of the _in pari delicto_ defense, the undisputed facts establish that H&K's conduct was not the proximate cause of Inofin's alleged losses because:

- Inofin already knew long before 2009 that its promissory notes were securities subject to federal and state regulations as a result of advice it had received from prior counsel, but chose to ignore.

- There is no admissible evidence that Inofin would have followed the securities advice that the Trustee alleges H&K should have provided to it in 2009.

- The new liabilities allegedly incurred by Inofin after January, 2009 were comprised of new borrowings which, as a matter of law, are not a harm to the Company. Instead, management's decision to use such borrowed money to fund ongoing business losses (or divert the money) is an intervening causal event that cuts off proximate cause.

---

[2] The Trustee's Complaint contains a single count of negligence. There is no allegation in this case – nor could there be – that H&K knew of or participated in Inofin's fraudulent activity. A claim of this nature was asserted against H&K by certain creditors of Inofin. However, a Superior Court BLS Judge (Sanders, J.) dismissed that claim on a Rule 12(b)(6) motion. Defendants' Appendix in Support of Motion for Summary Judgment ("App.") 41.

## Summary of Undisputed Facts

### A.     Inofin's Business

Since its formation in 1994 and continuing until December, 2010, Inofin was in the motor vehicle finance business, owned and controlled principally by two individuals, Michael Cuomo ("Cuomo") and Kevin Mann ("Mann"). Inofin funded dealer loans to consumers in the subprime market. Facts, ¶¶ 1-3.[3]

Inofin raised capital to fund its operations by loans from both secured and unsecured creditors. As to the unsecured creditors (typically referred to by Inofin as "investors"), Inofin issued standard form promissory notes and loan agreements. The loan agreements all provided that the investor funds would be used solely to purchase retail installment sales contracts. Facts, ¶ 2.

### B.     Inofin Ignores Securities Advice from Prior Counsel

As early as 1994, Inofin retained the law firm Sherburne, Powers & Needham, P.C. ("SPN") to provide securities advice. Robert Allison, a partner at SPN, advised Inofin that its notes were regulated securities, and advised Inofin on the steps to be taken to offer its notes to investors in accordance with the law. Facts, ¶¶ 4-6, 11. This led to the development of a private placement offering memorandum ("PPM") submitted to the Massachusetts Securities Division in or around May 1995. Facts, ¶¶ 6-7. Inofin's President, Cuomo, as well as Mann were involved in the process by which the PPM was approved by the Securities Division. Facts, ¶¶ 8-10.

Inofin did not in fact use the SPN offering memorandum to solicit investors and ignored other securities advice given by SPN, including SPN's advice to keep track of accredited and non-accredited investors. Facts, ¶¶ 12, 19. Instead, without consulting SPN, Inofin created its

---

[3] "Facts" refers to the Concise Statement of Material Facts, filed herewith.

own "Investor Package" and "Executive Summary" which it used to solicit investments from members of the general public. Facts, ¶¶ 13-14.

In 1998, Inofin terminated SPN and hired the law firm Sullivan & Worcester ("S&W"). Facts, ¶ 15. While S&W did not work with Inofin on the issuance of unsecured promissory notes to investors, on more than one occasion, S&W provided advice and other legal services to Inofin in which it indicated that Inofin's notes were securities. Facts, ¶¶ 17-18. Nonetheless, Inofin continued raising capital through the issuance of unsecured promissory notes without attempting to comply with the securities laws. Facts, ¶ 19. By 2010, there were hundreds of investors in Inofin with unsecured promissory note obligations totaling in the aggregate over $66 million. Facts, ¶ 20.

### C. Inofin's Diversion of Investor Money in Breach of its Representations to Investors

In the early 2000's, Inofin began to divert investor funds to affiliated startups owned by Mann and Cuomo. Facts, ¶¶ 22-23. In 2003 and 2004, Mann and Cuomo established four separately incorporated automobile dealerships, known as "Drive USA" (the "Drive Entities"). They also established a number of real estate companies, known as the "Prime Entities," to own or lease the underlying real estate where the Drive stores were located. Some of the Prime Entities also acquired and developed residential real estate in Massachusetts and Florida. Facts, ¶ 26. Mann and Cuomo were the sole owners of the various Prime Entities, and at least until August, 2005, were the sole owners of the Drive Entities. Facts, ¶¶ 24-25.

The Drive and Prime Entities were funded primarily by unsecured loans from Inofin, which in turn derived its capital from investors in Inofin. Facts, ¶¶ 2, 27. Inofin did not change its loan documents to reflect the use of investor money for the Drive and Prime Entities, nor did the Executive Summary disclose the existence of these Entities, let alone the fact that investor

money was being diverted to fund startup costs and later operating losses of these affiliates. Facts ¶¶ 13, 21, 35. Cuomo instructed his administrative assistant not to discuss the Drive or Entities Prime with any investors. Facts, ¶ 36.

From 2005 through at least 2009, Inofin loaned the Drive and Prime Entities millions of dollars. By the end of 2009, Inofin had accumulated over $25 million in loan receivables from Drive and Prime, comprising 44% of Inofin's total assets. Facts, ¶¶ 28-32 . The Trustee admits that the Drive and Prime Entities were "financial disasters," losing money every year in which they operated. Facts, ¶ 33. Inofin's 2009 audited financials reflected a write-off of $12.3 million in receivables from the Drive Entities and more than a $6.7 million write-down in receivables from the Prime Entities. Facts, ¶ 139. In this action, the Trustee admits that a significant cause of Inofin's insolvency was the diversion of investor funds into the Drive and Prime businesses. Facts, ¶ 22.

### D. Inofin's Misrepresentations to the Massachusetts Division of Banks And the Sham Sale of Drive

Inofin's lending activities were regulated by the Massachusetts Division of Banks ("Division").[4] The Division regulations included a "financial responsibility" requirement that Inofin maintain a "Net Worth" of at least $20,000 in order to remain in business. See 209 CMR 20.03; Facts, ¶¶ 39-40 . The regulations define "Net Worth" to be a calculation of "total assets less total liabilities," *excluding* from assets, among other enumerated categories of assets, "any asset due from officers or stockholders of the applicant or persons in which the applicant's officers or stockholders have an interest" (i.e., related-party receivables) 209 CMR 20.02 (Definitions).

---

[4] See M.G.L. c. 255B, §2.

1980149v2/18718-2

By April 15 of each year, Inofin was required to file with the Division an Annual Report with respect to the preceding calendar year. Schedule A of the Annual Report – a single page – provides for the Applicant to list its "net worth" on one line and "adjusted net worth" on the next line. Schedule A instructs the Applicant to omit from the calculation of adjusted net worth the same enumerated categories of assets which the regulations exclude for calculating "Net Worth." Thus, Schedule A instructs the Applicant to exclude related-party receivables from the calculation of "Adjusted Net Worth." Facts, ¶¶ 42,44. The Annual Report form reiterates the regulatory requirement that a motor vehicle finance company must maintain an "Adjusted Net Worth" of at least $20,000. Inofin was required to sign the Annual Reports under penalty of perjury expressly acknowledging the truth of the information contained in the accompanying schedules. Facts, ¶ 43.

In 2004, in response to an email inquiry from Cuomo, S&W advised Cuomo by reply email that in measuring net worth for purposes of satisfying the Division's financial qualifications, the regulations required exclusion of loans made by Inofin to any separate business owned by the officers of Inofin. Facts, ¶ 45. S&W's email concludes, "So, in answer to your question, a loan made by a finance company to a separate business is treated the same as a loan made to the officers [themselves] for purposes of measuring net worth, it would be excluded from the calculation of the finance company's total assets." Id.

Notwithstanding the regulations, the unambiguous instructions on Annual Report form and S&W's advice, on Schedule A of each of the Annual Reports submitted by Inofin to the Division for years 2005 through 2009, Inofin *included* among its assets the loans to the Drive Entities and the Prime Entities in its Adjusted Net Worth calculation. Facts, ¶¶ 46-50. In each instance, Cuomo signed the Annual Report under oath on behalf of Inofin. Facts, ¶ 43.

Had Cuomo excluded the related-party receivables, each such Annual Report would have shown that Inofin had substantial *negative* net worth and thus failed to satisfy the "financial responsibility" qualifications of the regulations. Facts, ¶ 51. Exclusion of just the Prime receivables also would have resulted in substantial negative adjusted net worth in each of those years. Id. The Trustee has admitted that the Division likely would not have renewed Inofin's license to operate, forcing Inofin to cease business operations, if its true financial condition had been disclosed in its filings with the Division. Id. ¶¶ 53-56.

The Division also required Inofin to submit annual GAAP-compliant audited or reviewed financial statements. Facts, ¶ 41; 20 CMR 20.03(2)(b) (Financial Statements). From the late 1990's through June, 2007, Inofin engaged the accounting firm Sharkansky & Company, P.C. ("Sharkansky") to prepare its financial statements. Per Sharkansky's advice, Inofin's financial statements for 2003 and 2004 were consolidated with those of the Drive Entities and the Prime Entities. Facts, ¶ 57.

During 2005, Inofin's management became concerned that if Inofin's financials continued to be consolidated with the Drive Entities, accumulating Drive losses – totaling over $3.5 million by the end of 2005 - would result in a balance sheet with a negative net worth for Inofin and thereby jeopardize its license. Facts, ¶¶ 58-59. In an effort to keep the Drive losses off the books of Inofin, Cuomo and Mann engineered a sale of the Drive Entities. Facts, ¶¶ 60-63. By instruments dated August 1, 2005, Mann and Cuomo purported to sell their interest in the Drive Entities to a certain Mark Walsh ("Walsh"), an individual who had a preferred stock interest in Inofin at the time. Facts, ¶ 60. The "sale" was structured as an exchange of stock: Inofin redeemed Walsh's preferred shares that had been paying him quarterly dividends in

exchange for Mann and Cuomo's shares in the Drive Entities. Mann and Cuomo were required to "resign" as officers and directors of these Entities. Facts, ¶ 62.

In fact, following the "sale," the Drive Entities continued to be controlled by and dependent upon Inofin and its officers, Cuomo and Mann. Facts, ¶ 64. Melissa George, the CFO of Inofin (and the daughter of Mann), also continued to maintain the books for Drive and Prime and she acted as the Chief Operating Officer of these entities. Facts, ¶¶ 65, 66. Inofin also continued to pay Walsh the equivalent of his quarterly dividends. Id. Walsh himself testified that he purchased the Drive Entities solely as a "favor" to Mann, with the understanding that "everything would stay the same." Facts, ¶ 67.

Every year after the "sale," Cuomo certified to the Rhode Island regulatory authorities that he and Mann were the sole owners of the Drive store operating in Providence, Rhode Island. Facts, ¶ 69. In 2006, several months after the "sale," Cuomo certified to the floor-plan financier of the Drive Entities that he and Mann continued to own and control these businesses. Facts, ¶ 68.[5]

### E. Inofin Refuses to Accept Sharkansky's Accounting Advice And Seeks a New Accountant

In 2006, Cuomo tried to persuade Sharkansky's auditor, Scott Estabrooks, to drop his insistence on consolidated financial statements based on the Drive "sale" to Walsh. Facts, ¶¶ 71, 80-81. Cuomo did not disclose to Sharkansky at that time that Inofin retained operational control of the Drive Entities or that Walsh continued to receive quarterly dividends from Inofin. App. 20, Affidavit of Robert E. Davis, ¶ 20. In November, 2006, Inofin's CFO, Robert Davis,

---

[5] Separately from the sham sale of the Drive Entities, in the final days of 2005, Inofin resorted to numerous accounting gimmicks, if not outright fraud, in a further effort to ensure that its year-end balance sheet would be positive. See Facts ¶ 61 and App. 20, ¶12-16.

resigned after refusing to sign Sharkansky's standard form anti-fraud letter in connection with their audit of the 2005 financials. Id., ¶¶ 17-18.

In June, 2007, Sharkansky advised Inofin that, due to continuing losses at the Drive businesses, Sharkansky would insist on a $5 million bad-debt reserve for loans to Drive (which would result in a negative balance sheet). Facts, ¶ 88. That same month, Inofin replaced Sharkansky as its accountant with a solo CPA, Mr. Richard Tobin ("Tobin"). Facts, ¶¶ 90-91. Tobin was nicknamed "Mr. Magoo," a reference to the nearsighted cartoon character. Facts, ¶ 91. In his reviewed-only financial statements for years 2006, 2007 and 2008, Tobin did not insist on consolidating Inofin with the Drive Entities, and expressed no opinion as to whether there should be a bad debt reserve for Drive or Prime. Facts, ¶ 95. Tobin understood (incorrectly) that the Drive Entities had been sold to a third party in an arms-length sale and did not know that Inofin continued to exercise control over those entities. Facts, ¶¶ 92-94.

F.      **Inofin Factors Substantial Auto Loan Receivables But Fails to Record the Costs of the Factoring On its Financials or Tell Its Professionals about It**

Lacking sufficient cash from operations or new investors to continue funding operations, in mid-2007, Inofin began factoring its auto loan receivables with Mid-Atlantic Finance ("MAF"). After applying discounts and commissions, Inofin was losing at least 8% of the value of so much of its loan portfolio as was factored to MAF. In 2007, Inofin factored over $2.2 million of its auto loan portfolio, in 2008 over $10 million, and in 2009 more than $9 million. In total, Inofin sold over $22 million of loans to MAF from 2007 through 2009. Facts, ¶¶ 108-110.

Inofin did not accurately account for the factored sales to MAF. Facts, ¶ 111. In particular, Inofin continued to carry the factored loans as assets on its balance sheet, did not expense the discount, and continued to report interest income on its financials for loans sold to MAF. Id. Tobin himself did not even learn about the factoring arrangement with MAF until

Spring, 2010.  Facts, ¶ 131.  As a result, the financials provided to the Division did not reflect the substantial expense of the factoring, and Inofin's net worth was inflated.  Facts, ¶ 111.  If Inofin had correctly accounted for the factoring transactions on its filings with the Division, these adjustments alone would have demonstrated that the Company had a negative net worth and it likely would not have retained its license. Facts, ¶ 55-56, 110-111.

G.    **H&K's Engagement and Services to Inofin**

In August, 2006, Inofin first engaged Hindlian at H&K for certain legal tasks.[6]  At least between December 25, 1998 to December, 2008, Inofin did not seek any securities advice from H&K related to its promissory note offerings to investors.  Facts, ¶¶ 14, 74, 77, 78, 97.  H&K was never involved in or consulted about the marketing of the unsecured notes to investors.  H&K also was not involved in preparing or reviewing Inofin's submissions to the Division.  Facts, ¶ 79.

H.    **Hindlian's Communications with Cuomo Concerning a PPM**

In late November, 2008, Cuomo forwarded to Hindlian an email from one of Inofin's investors, Robert Downing ("Downing"), proposing that Inofin issue notes to Fidelity's employees as part of their 401(k) plans.  In his email, Downing observes that such notes would likely be unregistered securities subject to an exemption under Rule 506 of Regulation D.  Facts, ¶ 98; App. 29.  By email dated December 9, 2008, Hindlian advised Cuomo about numerous complications with implementing Downing's proposal.  Hindlian's email refers to such promissory notes as "securities."  App. 29.  Inofin ultimately did not pursue the Fidelity opportunity.  In a later call with Cuomo, Hindlian offered to prepare a private placement memorandum for Inofin for discussion purposes.  Cuomo authorized that limited work.  Facts, ¶

---

[6] Hindlian had been involved to a very limited extent with Inofin while at SPN during the 1990's (2 hours of billable time), though he had not at that time been called upon to provide any securities advice, which had been handled by Allison.  Facts, ¶ 74.

99-100. The draft PPM which Hindlian sent Cuomo in early 2009, refers to the notes as "securities" to be offered pursuant to an exemption for accredited investors only. Facts, ¶¶ 101-104; App. 31.[7] In January and/or February, 2009, Cuomo requested that Hindlian cease further work on the PPM, and advised Hindlian that Inofin would not consider using one in connection with any future issuance of promissory notes. Facts, ¶ 107. Hindlian placed a post-it note on his draft PPM noting that the client would not consider using it. Id.

I. **Inofin's Misrepresentations to the Division and Investors After January 1, 2009**

On March 31, 2009, and again on April 13, 2010, Cuomo submitted Annual Reports under oath to the Division which deliberately overstated Inofin's "adjusted net worth." On March 31, 2009, Cuomo swore that Inofin's "net worth" and "adjusted net worth" as of December 31, 2008 were both approximately $3 million based on assets with a value of approximately $63.5 million. But, the $63.5 million asset value included approximately $12 million in Prime receivables and $5.3 million in Drive receivables. Facts, ¶ 112. Had these related party receivables been properly excluded from Inofin's assets in the adjusted net worth calculation, Inofin's adjusted net worth would have been negative by millions of dollars and the Division likely would not have renewed Inofin's license, forcing Inofin to shut down its business. Id.

The April 13, 2010, Annual Report stated Inofin's "net worth" and "adjusted net worth" as of December 31, 2009 were both approximately $2 million based on assets valued at approximately $70 million. The $70 million in assets included $13.2 million in Prime receivables and $12.3 million in Drive receivables. Facts, ¶ 113. These statements to the Division also were knowingly false. Facts, ¶¶ 42-51. Again, had these related party receivables

---

[7] Hindlian did not review any prior note offerings at the time he prepared the draft PPM, nor was he asked to do so. Facts, ¶ 97.

been excluded, Inofin's adjusted net worth would have been negative by many millions of dollars resulting in Inofin losing its license to operate. Facts, ¶ 113.

During 2009 and 2010, Inofin raised over $9 million of new money by issuing unsecured notes and entering into loan agreements with investors. Facts, ¶ 114. A significant portion of this money was used to fund the Drive and Prime Entities and Inofin operating losses. Facts, ¶ 121. The marketing materials provided to investors did not disclose that investor money was being used to fund Drive and Prime or Inofin business losses, and did not disclose that Inofin was selling off its retail installment sales contracts to MAF, let alone losing at least 8% of the contract value on each sale. Facts, ¶ 13.

### J.    The SEC and Division Investigation of Inofin

In September, 2009, the SEC initiated an investigation into Inofin. H&K represented Inofin in connection with the investigation until February, 2011. Facts, ¶ 123. The Trustee has no evidence as to what initially prompted the investigation. Facts, ¶ 124. As the investigation proceeded, it became clear that the SEC was focused on, among other things, alleged misrepresentations by Inofin to promissory note holders. Facts, ¶ 125. As a result of the investigation, the SEC filed a civil complaint against Inofin, Cuomo, Mann, George and others, alleging, among other things, violations of the anti-fraud provisions of the securities laws. Facts, ¶ 125. Mann, Cuomo and George each entered into a Consent Order with the SEC. App. 42-44.

In the course of the SEC's deposition of Melissa George, in May, 2010, the SEC learned of Inofin's practice of factoring its inventory of retail installment sales contracts to MAF. H&K also learned about the factoring for the first time during the deposition. It was only after the George deposition that Inofin finally disclosed the practice to its own accountant, Richard Tobin. Facts, ¶¶ 129-131.

1980149v2/18718-2

At H&K's insistence, Inofin promptly disclosed the MAF issue to the Division and Inofin acknowledged in a signed writing that H&K had no prior knowledge of this practice. Facts, ¶ 130, 133. In June, 2010, the Division commenced its own examination of Inofin's books, and entered into a Consent Order with Inofin. Facts, ¶ 132. Among other things, the June Consent Order required Inofin to engage an accounting firm other than Tobin to audit Inofin's 2009 financial statements. Facts, ¶ 134. Inofin retained Friedmann Suvalle Salomon, P.C. ("FSS") to perform the audit.[8] Facts, ¶ 135. However, by December 2010, FSS had concluded that Inofin's financial statements were unauditable and its engagement terminated. Facts, ¶136.

### K. The Division Shuts Inofin Down

Despite the requirement of the Consent Order, Inofin engaged Tobin to perform the 2009 audit that FSS had concluded could not be done. On December 10, 2010, Tobin completed an audit of the Company's 2009 balance sheet. As a result of long overdue adjustments, the Tobin-audited balance sheet reflected a net worth of negative $29 million. Facts, ¶ 139.

On December 30, 2010, the Division issued a cease and desist order against Inofin ("Cease and Desist Order"). The Cease and Desist Order was based on a detailed recitation of facts which the Division asserted "warrant the belief that Inofin is not operating honestly, fairly, soundly and efficiently in the public interest." Facts, ¶ 140.

### L. The Bankruptcy Filing and the Criminal Charges Against Cuomo and Mann

On February 9, 2011, 38 of Inofin's creditors filed an involuntary petition against Inofin under Chapter 7 of the Bankruptcy Code, later joined by an additional 41 creditors. Facts, ¶141.

On April 2, 2015, criminal charges were brought against Mann and Cuomo for wire fraud, mail fraud, and conspiracy. Facts, ¶ 142. The criminal case against Mann and Cuomo is

---

[8] H&K also arranged for FSS to analyze the impact of the MAF transactions upon Inofin's Financial Statements. Among other things, FSS found that as of December 31, 2008, Inofin's assets needed to be reduced by approximately $8.4 million on account of the incorrectly booked MAF transactions. Facts, ¶ 135, App. 48.

still pending.  During his deposition in this case, Cuomo asserted his Fifth Amendment privilege in response to questions by H&K's counsel.  Facts, ¶ 143.

### Argument

**A.**     **The Trustee's Malpractice Claim Fails under the Doctrine of In Pari Delicto**

At its core, the defense of in pari delicto is designed to "prohibit[] plaintiff[s] from recovering damages resulting from their own wrongdoing."  Nisselson v. Lernout, 469 F.3d 143, 151 (lst Cir. 2006); Scattaretico v. Puglisi, 60 Mass. App. Ct. 138, 140, n. 6 (2003) (same).  Here, the Trustee stands in Inofin's shoes.  Therefore, he is subject to the defense to the same extent as Inofin would have been had it brought this lawsuit.  See Gray v. Evercore Restructuring LLC, 544 F.3d 320, 323, note 1 (lst Cir. 2008); Baena v. KPMG LLP, 453 F.3d 1, 3-4 (lst Cir. 2006); Nisselson, 469 F.2d at 153 ("[T]here is no 'innocent successor' exception available to a bankruptcy trustee in a case in which the defendant successfully could have mounted an in pari delicto defense against the debtor.").

The in pari delicto defense applies where "(i) the plaintiff, as compared to the defendant, bears at least substantially equal responsibility for the wrong he seeks to redress, and (ii) preclusion of the suit would not interfere with the purposes of the underlying law or otherwise contravene the public interest."  Nisselson, 469 F.3d at 152.  In pari delicto has been applied to preclude claims of legal malpractice.  See Gray, 544 F.3d at 326; Choquette v. Isacoff, 65 Mass. App. Ct. 1, 3 (2005).[9]

The undisputed facts in this case establish that each of the conditions for in pari delicto has been met.

---

[9] See also In re Dublin Securities, 133 F.3d 377, 380-81 (6th Cir. 1988) (in pari delicto barred trustee's malpractice claim against attorneys); In re Greater Southeast County Hosp. Corp. I, 353 B.R. 324, 369 (Bankr. D.C., 2006) (court dismissed trustee claim against law firm where "the only alleged wrongdoing of the Law Firm Defendants was their facilitation of the misconduct of the debtors, who well knew that they were insolvent … the fault of the Law Firm Defendants could not have been greater than the fault of the debtors.").

## 1. __Inofin Bears More than Equal Responsibility for the Alleged Harm__

The Trustee alleges that Inofin's business was wrongfully prolonged after January 1, 2009. He seeks compensation for the new note liabilities incurred by Inofin from January 1, 2009 to the Petition Date (February 9, 2011). App. 33, p. 5. It is undisputed, however, that Inofin's own wrongful conduct contributed directly to prolonging the Company's business during this time. Specifically, Inofin prolonged its existence by (i) misrepresenting its financial condition in the filings it made to the Division, and (ii) making misrepresentations to investors in order to obtain new capital. Facts, ¶¶ 2, 13, 21, 35, 43-45, 50-52. The Trustee does not dispute the following core facts concerning this conduct:

1. Inofin misstated its financial condition on each of the Annual Reports it filed with the Division from April 2007 to April 2010 by swearing under oath that it had a positive adjusted net worth in excess of the required $20,000 when, in fact, the Company had negative adjusted net worth. In each such Annual Report, Inofin included receivables due from the Prime Entities as assets in calculating adjusted net worth even though (i) the Annual Report form itself required exclusion of such assets, and (ii) Inofin had been advised by prior counsel (S&W) that such assets should be excluded. Facts, ¶ 43-45, 50-52.

2. During 2009 and 2010, Inofin obtained in excess of $9.0 million in new loans from investors to enable it to continue in business. Facts, ¶ 114. In its loan agreements with investors during this time, Inofin represented and agreed that loan funds would be used *solely* for the purchase of retail installment contracts when, in fact, Inofin knew that loan funds would be used to fund the Drive and Prime Entities and ongoing multi-year operating losses for both Inofin and the related entities. Id., ¶¶ 2, 21, 35.

On these facts alone (and without reference to the abundant additional evidence of Inofin's fraud), no reasonable factfinder could conclude that H&K is more culpable than Inofin for prolonging Inofin's business from January 1, 2009 to the Petition Date. Inofin's misrepresentations to the Division and its investors were the primary means by which it was able to remain in business during this time period. (Indeed, Inofin had been misrepresenting its financial condition since 2005 and likely would have been out of business in 2006 or 2007 if it

16

had just been truthful with the Division or its investors.)  By contrast, the Trustee does not allege that H&K performed any wrongful act with the intention of prolonging Inofin's business.  The Trustee concedes that H&K (i) played no role in Inofin's submissions to the Division, (ii) was not involved in the marketing or offering of notes to investors, and (iii) was not involved in either the creation of the Drive or Prime Entities or the diversion of investor monies to those entities.  Facts, ¶¶ 37-38, 77-79.  Instead, the Trustee's sole claim against H&K is that, in early 2009, the firm *negligently* failed to provide complete securities advice concerning potential offerings to investors.

Since the underlying facts concerning Inofin's conduct are undisputed, resolution of the in pari delicto defense can and should be resolved at summary judgment.  Indeed, courts frequently dismiss claims against professionals on in pari delicto grounds on facts similar to those present here.  Gray, 544 F.3d at 326 (where debtor misrepresented financials in court filings, trustee's negligence claim against professionals dismissed under Rule 12(b)(6) on in pari delicto grounds; debtor "cannot avoid the consequences of its own actions by shifting blame to its hired professionals"); Peterson v. McGladrey LLP, 792 F.3d 785, 787 (7th Cir. 2015) (Rule 12(b)(6) dismissal where funds engaged in fraud, but accountants were accused of negligence); Baena, 453 F.3d at 8 (affirming Rule 12(b)(6) dismissal of accounting malpractice claims against auditor); Mosier v. Callister, Nebeker & McCullough, 546 F.3d 1271, 1277 (10th Cir. 2008) ("the underlying facts are not disputed, and no reasonable jury could conclude from those facts that [the law firm's] conduct is more culpable than that of [the debtor].  Thus, the district court could properly enter summary judgment in favor of [the law firm] based on its defense of in pari delicto"); Choquette, 65 Mass. App Ct. at 7-8 (affirming grant of summary judgment in favor of attorney on in pari delicto grounds).

17

### (i)   The Defense Applies Even Though H&K's Alleged Negligence Is Different In Kind From Inofin's Wrongdoing

In pari delicto applies so long as the conduct of the plaintiff and the defendant both are alleged to contribute to the same harm sought to be redressed irrespective of whether the plaintiff and the defendant have engaged in precisely the same alleged misconduct. Accordingly, the Trustee cannot escape application of the in pari delicto doctrine simply because H&K did not participate in Inofin's fraud.

The Seventh Circuit's recent decision in Peterson illustrates the point. In Peterson, the debtors had misrepresented to investors that their money would be used to finance certain inventory and would be secured by that inventory. In fact, the money was used to fund a Ponzi scheme. The bankruptcy trustee brought an accounting malpractice claim against the debtors' auditor alleging that he negligently failed to perform spot checks that would have detected the debtor's fraud. The District Court allowed the auditor's motion to dismiss on in pari delicto grounds and the Seventh Circuit affirmed. 792 F.3d at 788. The Trustee "insist[ed] that the pari delicto doctrine ... applies only when the plaintiff and the defendant commit the same misconduct. If they commit different misconduct that contributes to a single loss then, … the [ ] doctrine drops out." Id. at 787. The Court disagreed, noting that the Trustee had "not found any decision holding or even saying in dictum that it applies only when two parties participate in a single wrong." Id. at 787-788. The Court explained that applying the doctrine would further the doctrine's underlying principles. Id., quoting Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 306 (1985).

Courts in this Circuit and others have reached the same conclusion and refuse to draw technical distinctions between the nature of the wrongs committed by the parties. See e.g. Nisselson, 568 F. Supp. 2d at 157 (applying in pari delicto doctrine to preclude a trustee's breach

of fiduciary duty claim and noting that trustee's efforts to draw technical distinctions between wrongs has been "squarely rejected by courts").  See also Peltz v. SHB Commodities, Inc., 115 F.3d 1082, 1090–91 (2d Cir. 1997) (rejecting plaintiff's attempt to evade the in pari delicto defense on the grounds that his wrongdoing was not the same wrongdoing he sought to redress and deeming the argument to be "outdated," "hypertechnical," and "miss[ing] the mark"); OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.), 389 B.R. 357, 371 (D. Del. 2008) (concluding that the plaintiff's attempt to separate the wrongs committed by plaintiff and defendant was unsupported by the relevant case law and holding that the in pari delicto defense barred plaintiff's breach of fiduciary duty claims).[10]

Massachusetts law, which applies here, also is consistent with Peterson.  See Choquette, 65 Mass. App. Ct. at 3 (the doctrine "bars a plaintiff who has participated in wrongdoing from recovering damages for *loss* resulting from the wrongdoing.") (emphasis added).  There are no Massachusetts cases precluding application of the doctrine where two different types of alleged misconduct contribute to the same loss.

2.    **Dismissal of the Trustee's Claims Will Not Interfere with the Purpose of the Doctrine or Contravene Public Policy**

Dismissal of this lawsuit does not implicate any matters of public policy.  The Trustee is not bringing claims on behalf of a blameless party.  Rather, he stands in the shoes of a company that defrauded investors and public agencies for many years.  See Nisselson, 469 F.3d at 157

---

[10] See also Knauer v. Jonathan Roberts Fin. Grp., Inc., 348 F.3d 230, 233 (7th Cir. 2003) ("the equitable doctrine of in pari delicto … prohibits a plaintiff from maintaining a claim if the plaintiff himself bears equal fault for the alleged injury"); Alabama Great Southern Railroad Co. v. Chicago & N.W.Ry. Co., 493 F.2d 979, 985 (8th Cir. 1974) ("joint tortfeasors are in pari delicto where each are guilty of acts or omissions which could have proximately caused the underlying injury"); Bash v. Textron Fin. Corp., 483 B.R. 630, 652 (N.D. Ohio, 2012) ("the in pari delicto doctrine applies because the debtor is at least 'equally' responsible for the harm"); Christians v. Grant Thornton, LLP, 733 N.W.2d 803, 814 (Minn. App. 2007) ("trustee was equitably barred from recovering" against firm accused of accounting malpractice because debtor "bears at least substantially equal responsibility for the injury it seeks to remedy").

(where "trustee is not bringing claims on behalf of an innocent target of the fraud, but, rather, on behalf of a complicit party … the trustee's policy concerns ring hollow."); <u>Official Com. of Unsecured Creditors of PSA, Inc. v. Edwards</u>, 437 F.3d 1145, 1155 (11th Cir. 2006) (finding public policy exception inapplicable in analogous circumstances). Instead, dismissal would be entirely consistent with the purposes of the <u>in pari delicto</u> doctrine, i.e., "denying judicial relief to an admitted wrongdoer." <u>Nisselson</u>, 469 F.3d at 151.

**B.      The Trustee's Claim Fails for Lack of Proximate Causation**

**1.      Inofin Knew Long Before 2009 That Its Promissory Notes Were Subject to the Securities Laws**

The false premise underlying the Trustee's claim in this case is that Inofin did not understand that the promissory note offerings it made to investors were regulated by the securities laws. In fact, the undisputed evidence confirms that SPN so advised Inofin at the inception of the Company's existence. Facts, ¶¶ 5-11. Indeed, the Trustee expressly admits that Inofin engaged SPN to advise it concerning the offering of promissory notes to investors. He further admits that Mr. Allison, a partner at SPN, provided such advice, drafted a PPM for Inofin to use in connection with the offering of notes to investors and sought approval from the Massachusetts Securities Division for the PPM. <u>Id</u>. It also is undisputed that Allison warned Inofin that the notes were subject to federal and state securities regulation, that Inofin should use the PPM in connection with the offering of notes to investors and that it should keep track of the numbers of accredited and unaccredited investors to whom such notes were offered. Facts, ¶ 11. Inofin simply chose not to follow SPN's advice in offering notes to investors. Facts, ¶ 12-14. Allison (who has submitted an affidavit) confirms that he provided this advice to Inofin. Appendix 5.

The Trustee has not alleged that SPN's advice was negligent or incomplete. In his report, the Trustee's standard of care expert does not even address SPN's advice. Facts, ¶ 11. In fact, at the time he prepared his report, the Trustee's expert was unaware that SPN had provided any securities advice to Inofin. Id.

Simply put, H&K cannot be the cause of any damage arising from Inofin's failure to comply with the securities laws because Inofin already knew from prior counsel that its note offerings were subject to those laws. See, e.g., Peterson, 792 F.3d at 787 ("McGladrey cannot be liable to the Funds for failing to detect and reveal what [principal of the funds] already knew").

There is no admissible evidence on which the Trustee can rely to create a triable issue of fact on this matter. H&K anticipates that the Trustee may try to rely upon snippets of Cuomo's deposition testimony during the Trustee's direct examination of him in this case to suggest that Cuomo was unaware that the Company's notes were regulated securities. Cuomo's deposition testimony does not create any issue of fact, however. First, Cuomo's deposition testimony is inadmissible because H&K's counsel was prevented from conducting a full cross-examination of Cuomo due to the fact that he asserted his Fifth Amendment privilege during the second day of his deposition. Facts, ¶143 and App. 40. H&K's counsel was only able to examine Cuomo for approximately one hour during the first day of his deposition. Id. See SEC v. Ficken, 546 F.3d 45, 52-54 (lst Cir. 2008) (party cannot rely upon direct testimony where opposing party precluded from cross-examining witness as a result of witness asserting Fifth Amendment privilege); Com v. Arrington, 455 Mass. 437, 445-446 (2009) (witness's prior recorded testimony inadmissible where defendant's attorney did not have reasonable opportunity to cross-examine her).[11]

---

[11] Defendants noticed the deposition of Melissa George who also invoked her Fifth Amendment rights and refused to answer any questions. Facts, ¶144, App. 45.

Even if it is admitted, Cuomo's deposition testimony confirms that SPN had advised Inofin that its promissory note offerings to investors must comply with the securities laws. For instance, on the first day of his deposition, when shown the SPN correspondence with Inofin, Cuomo testified as follows:

> Q:    So what Mr. Allison was advising the company is that the company must comply with securities laws in connection with the issuance of the promissory notes to investors, right?
>
> A:    Yes.
>
> ....
>
> Q:    Mr. Allison told you that the notes were securities, right?
>
> A:    Yep.
>
> Q:    And he provided materials which you were to provide to investors, right?
>
> A:    I guess, yeah.
>
> ....
>
> Q:    And Mr. Allison's legal advice to the company is if you're going to offer promissory notes to investors, you do it through an exemption to the securities laws, right?
>
> A:    Uh-huh.
>
> Q:    Yes?
>
> A:    I guess, yeah.

App. 46, Depo. Trans. Michael J. Cuomo, 224:19-23, 230:9-14, 242:7-13[12]

Finally, even if there was admissible evidence suggesting that Cuomo did not understand that Inofin's notes were securities as of early 2009, that would not be sufficient to create an issue of material fact because Allison's affidavit confirms that SPN provided the same advice to

---

[12] Defendants cite this testimony from Cuomo for the Court's consideration only if it determines that the Cuomo deposition is admissible. Defendants contend that it is not.

Mann, another officer and shareholder of Inofin. Mann's knowledge is imputed to Inofin. See United States v. Bank of New England, 821 F.2d 844, 856 (lst Cir. 1987). For each of these reasons, there is no causal connection between the alleged lack of advice provided by H&K in 2009 and any damage the Trustee seeks in this case.

### 2. There Is No Admissible Evidence That Inofin Would Have Followed H&K's Securities Advice or Allowed Inofin to Cease Operations in Early 2009

Even if Inofin did not know as of early 2009 that its notes were regulated by the securities laws, the Trustee still must prove that Inofin would have accepted and acted on the advice he contends H&K should have provided at that time which, the Trustee contends, would have resulted in Inofin ceasing operations. Given Inofin's history of ignoring advice from lawyers and accountants (Facts, ¶¶ 12-14, 18-19, 45, 50, 75, 81-90), the Trustee cannot simply assume that Inofin would have followed specific advice provided by H&K; he must submit admissible evidence that it would have done so.

There is no such evidence. As discussed above, the Trustee cannot rely upon any deposition testimony of Cuomo in this case. There is no admissible evidence from any other director or shareholder of Inofin that the Company would have accepted securities advice from Hindlian in 2009. The record evidence strongly suggests that Inofin would have ignored any advice that put its continued existence in peril. Exactly what would have occurred if H&K had provided different advice to Inofin in early 2009 is, at best, a matter of speculation. For this additional reason, the Trustee's Complaint must be dismissed. See Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 461-62 (1997) (summary judgment in legal malpractice case where plaintiff had no evidence that client would have followed attorney's advice). See also Van Brode Group, Inc. v. Bowditch & Dewey, 36 Mass. App. Ct. 509 (1994) (affirming directed verdict in favor of law firm where plaintiff's loss required speculation on the part of jury).

23

### 3. There Is No Causal Connection between H&K's Alleged Negligence and the Claimed "Deepening Insolvency" or "Increased Liabilities" Damages

The Trustee's damage claim in this case is based upon an expert report prepared by Craig Jalbert ("Jalbert Report") which concluded that, during its final two calendar years, from January 1, 2009 through December 31, 2010, Inofin accrued an additional $12,387,740 in liabilities while its assets increased by only $674,834.[13] App. 33. According to the Jalbert Report, the increase in liabilities was comprised almost entirely of new unsecured investor money and additional secured indebtedness. There is no dispute that Inofin already was insolvent as of January 1, 2009 by millions of dollars. The Jalbert Report acknowledges that the money raised from new loans was used to fund Inofin's continuing losses during this two-year period. However, the Trustee argues that the new liabilities that accrued from January 1, 2009 to the Petition Date somehow harmed the Company. The Trustee's theory of causation and damages, which is simply a version of "deepening insolvency,"[14] fails.

Whether the Trustee's theory of causation and damages is called "deepening insolvency" or "increased liabilities," it is fatally flawed. Additional liabilities comprising new loans is not a form of damage as a matter of law and under elementary accounting principles. This is because, for every dollar borrowed, the Company's assets increase by one dollar. See Off. Comm. of Unsecured Creditors of Propex Inc. v. BNP Paribas (In re Propex Inc.), 415 B.R. 321, 327

---

[13] Defendants contend that Jalbert's expert opinion is based upon unreliable evidence and is inadmissible. Indeed, the Jalbert Report acknowledges that it does not accurately depict Inofin's financial condition. Among other things, its asset figures are not adjusted to reflect impairment or fair value. App. 33. In the event this case proceeds to trial, defendants will seek to exclude Mr. Jalbert from testifying. Even assuming that Jalbert's figures are correct, however, defendants are entitled to summary judgment.

[14] Deepening insolvency has been defined as "an injury to a [debtor's] corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." In re CitX Corp., Inc., 448 F.3d 672, 677 (3d Cir. 2006) (quoting Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 347 (3d Cir. 2001), predicting Pennsylvania law).

(Bankr. E.D. Tenn. 2009) (recognizing that ordinary loans are "balance sheet neutral because the incoming loan proceeds balance the new repayment obligation"); <u>Off. Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)</u>, 353 B.R. 820, 842 (Bankr. D. Del. 2006) ("[A] loan ... increases liabilities (the Amount of the loan) and assets (the cash provided by the loan) in the same amount."). Thus, borrowing money is not a form of damage. <u>See</u> <u>generally</u>, Sabin Willet, <u>The Shallows of Deepening Insolvency</u>, 60 Bus. Law. 549, 552-57 (2005) (explaining how the borrowing of money by an insolvent company does not deepen the insolvency, because for every dollar that is borrowed, the company's liabilities and assets each increase by one dollar).[15] Indeed, even the Trustee's expert admits that borrowing money is a "balance sheet neutral event." App. 47, 121:9-24.

Courts and commentators are virtually unanimous in holding that a professional, who through alleged malpractice, enables a company to borrow money or raise equity, cannot be liable for the company's subsequent losses resulting from management's use of the new money. Rather, the decisions management makes to use new money to fund their company's losses and/or to prolong their company's existence are intervening events that cut off proximate cause as a matter of law. This is particularly so, where, as here, there is no evidence (or even an allegation) that H&K participated in management's business decisions.

Recent decisions of the Federal Court of Appeals for the Third Circuit, <u>Marion v. TDI Inc.</u>, 591 F.3d 137 (3d Cir. 2010) and <u>In re CitX Corp.</u>, 448 F.3d 672, 677-78 (3d Cir. 2006) are

---

[15] <u>Thabault v. PriceWaterhouseCoopers LLP</u>, 541 F.3d 512 (3d Cir. 2008), is consistent with the law set forth above. In that case, the Court upheld a finding that an auditor was liable for damages arising from the increase in liabilities incurred by an insurance company consisting of claims against policies issued by the insurance company. The auditors' negligence caused the company to assume contract obligations greater than the benefit received. Specifically, damages consisted of claims paid net of premiums received. <u>Id.</u> at 523. That is, to the extent the damages arise from a new liability, the new liability was reduced by the benefit received. If the benefit is the cash proceeds from a loan, then the liability arising from the loan cannot be a damage, since the benefit provided by the loan proceeds offsets the liability incurred dollar-for-dollar.

directly on point. In <u>Marion</u>, the Third Circuit overturned a jury verdict in favor of a federal receiver on the grounds that proximate cause was lacking. <u>Marion</u> concerned a Ponzi scheme in which a company was brokering the sale of fictitious CD's to raise money to pay clients who had either bought fictitious CD's themselves or who were looking to cash out of real CD's. The jury appears to have found that the defendants provided funds to the retail broker knowing the funds were being used to keep the scheme afloat and further that defendants had failed to adequately supervise the retail broker in his CD-brokerage business. 591 F.3d at 145, 150. Just as the Trustee is seeking in this case, the <u>Marion</u> jury awarded damages equal to the new money that was invested in the scheme by creditors after the defendants breached their obligations. The district court denied defendants' request for judgment notwithstanding the verdict. The Third Circuit reversed. Referring to its reasoning in its prior decision in <u>In re CitX Corp</u>., the Court held that a third party can *never* have liability to a corporation for increasing its liquidity.

> This is so even where (as alleged here) the new money brought into the company allowed it to stay afloat long enough to put itself in a worse position than it was in prior to the cash infusion. [citations omitted]

> The problem in this kind of scenario is one of proximate causation. Between the initial act (the injecting of money into the business) and the end result (the expansion of the company's debt relative to where it was prior to the cash infusion) stand the intervening acts of the company's management (i.e., what it chose to do with the money). We illustrated this point in *CitX*. There the trustee for a company that had operated a Ponzi scheme brought suit against the company's accounting firm, arguing that the firm's negligent financial reports had allowed it to hide its true financial condition from investors, thus raising more money and eventually going even deeper into debt. 448 F.3d at 674-78. We held that a jury could not conclude that the accounting firm had caused the company's economic injuries on those facts, reasoning as follows:

>> [CitX argues] that the $1,000,000 equity investment allowed CitX to exist long enough for its management to incur millions more in debt. But

> that looks at the issue through hindsight bias. ...
> [T]he equity investment was hardly harmful to
> CitX.  Its management ... misused the opportunity
> created by that investment; ... and herein lies the
> harm to CitX. [citation omitted]

Id. at 150.  Thus, the Court concluded, "[t]he losses [the company] suffered as a result were proximately caused by [the company's owner]'s subsequent actions, not the cash infusion itself." Id., at 151.

The Marion and CitX precedents fit the facts of the present case.  The Trustee alleges that the malpractice of H&K in failing to properly advise Inofin on compliance with securities laws caused Inofin to continue borrowing money which funds were dissipated through continuing losses of Inofin.  As noted above, increasing liquidity by borrowing money is not an injury suffered by Inofin – that is a balance sheet neutral event.  The injury occurred due to management's decision to squander the money on the Drive and Prime Entities or otherwise to fund ongoing operating losses.

Numerous other Courts have endorsed the principles of CitX.  See, e.g., Fehribach v. Ernst & Young LLP, 493 F.3d 905, 909-910 (7th Cir. 2007) (accounting firm not liable for deepening insolvency of client for failing to have included a "going concern" opinion in its audit three years before client collapsed); In re SI Restructuring, 532 F.3d 355, 363 (5th Cir. 2008) (also citing Delaware courts as rejecting deepening insolvency as either a cause of action or a theory of damages); In re Greater Southeast Community Hospital, 353 B.R. at 358 (Court rejected trustee's claims that lawyers who negligently prepared opinion letters enabling corporate clients to borrow money could be legally responsible for "the harms arising from the decision of the corporations' respective fiduciaries to deepen the insolvency of the companies.").  The Court

in <u>Community Hospital</u> summarized the law on this topic as follows: "*lawyers are not responsible for the business decisions of their clients.*" <u>Id</u>. (emphasis in original). [16]

For these reasons, the Trustee cannot as a matter of law establish that H&K is liable for increased borrowing liabilities incurred by Inofin during the two years following Hindlian's allegedly negligent advice.

### 4. There Is No Evidence That H&K Caused the SEC Investigation

Finally, the Trustee has suggested that H&K has some liability for the cost of the SEC investigation. The SEC investigation concerned misrepresentations Inofin had made to investors (and the Division) beginning at least in 2004 and continuing to 2010. Facts, ¶¶ 125-126. Even if Inofin had accepted advice from Hindlian in early 2009 and had complied with the securities laws with respect to offerings to investors thereafter, there is no evidence that this would have avoided an SEC investigation of Inofin's prior conduct. Facts, ¶ 128. Any claim that the investigation would not have occurred but for H&K's negligence is at best a matter of speculation and conjecture, and is therefore not a proper question for the jury. <u>Girardi v. Gabriel</u>, 38 Mass. App. Ct. 553, 560 (1995) (summary judgment appropriate where plaintiff could establish no more than a "mere possibility," and a "conjecture" by its expert, that, but for the negligence of lawyer, client's loss would not have occurred). Accordingly, H&K also is entitled to summary judgment to the extent that the Trustee is seeking damages for the costs incurred in defending the SEC investigation.

---

[16] Of course, if the law firm had aided and abetted the fraud, the law firm might be liable to the investors. Here, the Trustee has not alleged aiding and abetting. <u>Cf</u>., <u>Royal Indemnity Co. v. Pepper Hamilton LLP, et al</u>, 479 F.Supp.2d 419, 431 (D. Del. 2007) (deepening insolvency claims against law firm survived Rule 12(b)(6) where law firm is alleged to have conspired with its client in a fraudulent scheme); <u>In re Student Finance Corp</u>. 335 B.R. 539, 548-49 (D. Del. 2005) (law firm liable for deepening insolvency only on showing of fraud).

**Conclusion**

For each of the reasons set forth above, defendants request that the Court enter summary judgment dismissing all of the Trustee's claims in this Adversary Proceeding.

HOLLAND & KNIGHT LLP and
RICHARD J. HINDLIAN,

By their attorneys,

/s/ Laura A. Otenti
Nicholas J. Nesgos BBO #553177
David J. Reier BBO #546202
Laura A. Otenti BBO 660301
Posternak Blankstein & Lund LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-8004
(617) 973-6100
nnesgos@pbl.com
dreier@pbl.com
lotenti@pbl.com

CERTIFICATE OF SERVICE

IT IS CERTIFIED that the foregoing document was filed this 25th day of March, 2016 through the ECF filing system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Laura A. Otenti
Laura A. Otenti

1980149v2/18718-2